Amy **SHEPARD**, Plaintiff,

v.

Dr. Katrina **IRVING**, et al. Defendants.

No. CIV.A. 01–1093–A.

United States District Court,
E.D. Virginia.
Alexandria Division.

June 5, 2002.

Michael Jackson Beattie, Esquire, Fairfax, VA, for Plaintiff.

Jason Paul Cooley, Office of the Virginia Attorney General, Richmond, VA, for Defendants.

## *MEMORANDUM OPINION*

LEE, District Judge.

THIS MATTER is before the Court on Defendants' motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim. The plaintiff in this case is a college student with a learning disability who sought additional time on her assignments from her English professor. The professor denied her the additional time and suspected her of plagiarism. The professor later gave the plaintiff an "F" in her class and brought plagiarism charges against her with the university's student disciplinary board, the Honor Council. During the Honor Council proceeding, the plaintiff was not allowed to have an attorney represent her nor was she allowed to have her mother testify as a witness. Ultimately, the Honor Council convicted her of the charges as alleged, affirmed the "F" she received in her class, and gave her a written reprimand. Based on these actions, the plaintiff alleges violations under the Fourteenth Amendment (Count I), First Amendment (Count II), Americans with Disabilities Act ("ADA") and the Rehabilitation Act (Count III) against the professor, the university, the university's president, a university dean in charge of the Honor Council, and the students on the Honor Council.

Two issues are before the Court. The first issue is whether a public university, its officials, and students who presided over the Honor Council proceeding, are immune from suit for their role in initiating disciplinary proceedings and convicting the plaintiff of plagiarizing her assignment.

The second issue is whether the plaintiff states a claim for discrimination when she alleges violations based upon a professor's failure to accommodate her disability with more time on her assignments, giving her a failing grade, and initiating disciplinary proceedings against her.

Upon review of the pleadings and arguments of the parties, this Court holds as follows. First, the Court lacks subject matter jurisdiction over all claims against the students presiding over the Honor Council proceeding because they were acting in a quasi-judicial capacity during the proceeding and thus are entitled to absolute immunity from all claims arising out of such proceeding. Moreover, the plaintiff does not have a cause of action against the remaining defendant officials in their individual capacities for violations under Title II of the Americans with Disabilities Act and the Rehabilitation Act because these statutes are not actionable against individuals and the plaintiff is barred from bringing suit under 42 U.S.C. § 1983. In addition, all defendants are immune from liability for civil damages, pursuant to the doctrine of qualified immunity, for the plaintiff's claims arising under the Fourteenth Amendment Due Process Clause (Count I) and the First Amendment (Count II) because the plaintiff never alleges the deprivation of any clearly established constitutional right.

Nonetheless, the plaintiff may assert her Rehabilitation Act claim (Count III) against the defendant officials in their official capacities because the public university waived its sovereign immunity when it accepted federal funds. Moreover, the plaintiff may seek prospective injunctive relief for her ADA claim against the defendant officials in their official capacities pursuant to the *Ex parte Young* doctrine.

Second, the plaintiff fails to state a claim under the Fourteenth Amendment, First Amendment, Rehabilitation Act, and ADA. In particular, the plaintiff fails to state a claim for discrimination under the Fourteenth Amendment (Count I) because she does not allege the deprivation of any recognized constitutional interest. In addition, the plaintiff fails to state a claim for retaliation under the First Amendment (Count II) because she fails to allege that she suffered some adversity in response to her exercise of a protected right. Finally, the plaintiff fails to state a claim under the Rehabilitation Act and the ADA (Count III) because the allegations in the Complaint do not allege that she was excluded from any service, program, or benefit. Accordingly, Defendants' motions to dismiss are GRANTED.

## I. BACKGROUND

Plaintiff Amy Shepard ("Shepard") was a student at George Mason University ("GMU") during the summer of 2000. GMU is a state created university and is a recipient of federal education funding. During her tenor at GMU, Shepard utilized the GMU Disability Resource Center because she has a learning disability that limits her ability to concentrate and learn. Shepard requested accommodations through the Resource Center to allow her additional time to research and write her assignments. During Shepard's last semester prior to graduation, in the 2000 summer school session, Shepard took an English class taught by Professor Katrina Irving, Ph.D. Dr. Irving did not give Shepard extra time to complete her assignments. Shepard encountered difficulty properly completing her English written assignments and complained to the GMU Disability Resource Center about Dr. Irving's failure to allow Shepard the extra time. On July 21, 2000, Dr. Irving informed Shepard that she suspected Shepard of plagiarism, and subsequently gave Shepard a failing grade in her English class.

Subsequently, Shepard's mother spoke with Dean of Students Girard Mulherin, Ph.D. Dr. Mulherin told Shepard that she could file a grade appeal without fear of being prosecuted for the suspected plagiarism because GMU allows fifteen days to bring such charges before the school' Honor Council and the fifteen days had already expired. Accordingly, Shepard appealed her English grade.

On August 28, 2000, Dr. Irving filed a plagiarism charge against Shepard with the school's Honor Council. GMU's Honor Council is a student run organization, which adjudicates alleged violations of the school's rules. During the Honor Council proceeding, Shepard asked Dr. Mulherin if she could be represented by her attorney or her mother and also have her mother serve as a witness. Dr. Mulherin denied her request. It was GMU's policy not to have attorneys or law students represent students during such proceedings.

On November 2, 2000, Shepard filed a Complaint in this Court to halt the Honor Council proceedings. On March 21, 2001, this Court dismissed Shepard's case as unripe. On March 26, 2001, the Honor Council issued its decision finding Shepard guilty of the offense as charged, issued her a written reprimand, affirmed the "F" she received in her class, and ordered her to perform community service. Shepard appealed the decision and was unsuccessful.

On July 11, 2001, Shepard filed a second Complaint in this Court against Dr. Irving, Dr. Mulherin, GMU President Alan Merten, the Rector and Visitors of GMU, and Honor Committee Members, Lisa Stidham, Leigh Ann Murtha, Chrissy Forbes, and Joe Boatwright (collectively "Defendants") arising out of her failure to receive additional time to complete her assignments and the disciplinary proceedings instituted against her.

Count I alleges that Defendants' actions deprived Shepard of her liberty interest in her reputation and future employment and a property interest in her education in violation of the Due Process Clause of the Fourteenth Amendment. *See* U.S. CONST. amend. XIV. In particular, Shepard alleges due process violations arising from: (1) Dr. Irving failing to abide by GMU's own policy by filing honor charges more than fifteen days after Dr. Irving realized the violation; (2) GMU's policy barring attorneys and law students from representing an accused before the Honor Council; (3) Dr. Mulherin's refusal to let Shepard's mother represent Shepard during the proceedings in violation of GMU's own policy; and (4) Dr. Mulherin's refusal to allow Shepard the right to call her mother as a witness.

Count II alleges that Defendants retaliated against Shepard for exercising her First Amendment right to redress her grievance. *See* U.S. CONST. amend. I. In particular, Shepard alleges that: (1) in retaliation for Shepard's complaint about Dr. Irving, Dr. Irving gave Shepard a failing grade; and (2) in retaliation for Shepard contesting the grade in Honor Council, Dr. Irving disparaged Shepard's reputation, and prevented her graduation and anticipated employment.

Count III alleges that Defendants breached their obligation under the Americans with Disabilities Act of 1990 ("ADA") § 309, 42 U.S.C. § 12189, and the Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794(a), by failing to accommodate her disability. In particular, Shepard alleges that Defendants: (1) failed to make reasonable accommodations for her learning disability by not offering Shepard additional time to complete her assignments during the summer session; and (2) failed to reasonably accommodate Shepard at the Honor Council by not allowing someone to represent her.

Defendants Dr. Irving, Dr. Mulherin, President Merten, and GMU filed a motion to dismiss for lack of subject matter jurisdiction on the basis that they are immune from suit in their official capacities and they also move to dismiss for failure to state a claim for violations of due process, retaliation, and disability discrimination. In addition, Honor Committee Members, Murtha, Anderson, Stidham, and Forbes filed a motion to dismiss for lack of subject matter jurisdiction on the basis of absolute immunity and qualified immunity, and they move to dismiss Shepard's ADA and Rehabilitation Act claims for failure to state a claim. Honor Committee Member Boatwright also filed a motion to dismiss, which adopted the arguments of both groups of Defendants. These motions are now before the Court.

## II. DISCUSSION

Rule 12(b)(1) of the Federal Rules of Civil Procedure provide for dismissal of an action against a party where the court lacks subject matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1). When ruling on a 12(b)(1) motion to dismiss, the allegations of the complaint are accepted as true. *See Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982). The Court should not dismiss a claim for lack of subject matter jurisdiction unless it appears beyond a doubt that recovery would be impossible under any set of facts which could be proven. *See Gasner v. Board of Supervisors of County of Dinwiddie,* 162 F.R.D. 280, 282 (E.D.Va. 1995), *aff'd,* 103 F.3d 351 (4th Cir.1996).

Similarly, in considering a motion to dismiss under Rule 12(b)(6), the court should accept as true all well pled allegations of the complaint and view the complaint in the light most favorable to the plaintiff. *See Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993); FED. R. CIV. P. 12(b)(6). The court should grant a motion to dismiss for failure to state a claim only if it appears to a certainty that the plaintiff

cannot prove any set of facts in support of its claim that would entitle the plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ A court must first resolve jurisdictional issues before proceeding to the issue of whether the plaintiff has stated a claim. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). In addition, a court must resolve jurisdictional issues related to statutory construction before resolving jurisdictional issues related to sovereign immunity. *See Vermont Agency of Natural Res. v. United States,* 529 U.S. 765, 778–79, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). Accordingly, the issues before the Court are addressed as follows. First, the Court addresses whether Section 504 of the Rehabilitation Act creates a private cause of action against a State entity. Second, the Court addresses absolute immunity as it relates to the Honor Committee Members. Third, the Court addresses Eleventh Amendment immunity with respect to GMU, Dr. Mulherin, and Dr. Merten in their official capacities and Congress' attempt to abrogate such immunity for claims brought against them under the ADA and the Rehabilitation Act. Fourth, the Court addresses Eleventh Amendment immunity with respect to GMU, Dr. Mulherin, and Dr. Merten in their official capacities and their waiver of such immunity for claims under the Rehabilitation Act. Fifth, the Court addresses Eleventh Amendment immunity and Dr. Mulherin and Dr. Merten's liability for prospective injunctive relief under the *Ex parte Young* doctrine. Sixth, the Court addresses immunity for Defendants in their individual capacities for ADA and Rehabilitation Act claims, and the viability of causes of action under 42 U.S.C. § 1983. Finally, the Court addresses whether Shepard has properly stated a claim for violations un-

der the Fourteenth Amendment (Count I), violations under the First Amendment (Count II), and relief under the ADA and Rehabilitation Act (Count III).

## A. Private Right of Action under Section 504 of the Rehabilitation Act

■ Defendants argue that Congress has not clearly and unambiguously created a private right of action to enforce Section 504 of the Rehabilitation Act. Specifically, Defendants argue that there is nothing in the statute that puts States on notice that upon accepting federal funds they would be subjected to a private right of action under Section 504. When determining congressional intent to create a private right of action or to otherwise make a remedy available to a special class of litigants, a court should determine: (1) whether the statute was enacted for the benefit of a special class of persons, of which the plaintiff is a member; (2) whether there is any indication of legislative intent to create a private remedy; (3) whether the implication of such a remedy is consistent with the underlying purposes of the legislative scheme; and (4) whether implying a federal remedy is inappropriate because the subject matter involves an area basically of concern to the States. See Cannon v. Univ. of Chicago, 441 U.S. 677, 689–708, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (citing Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)).

■ The Seventh Circuit in Lloyd v. Regional Transportation Authority analyzed these factors in light of Section 504 and made a determination that Section 504 created a private right of action against a State entity. 548 F.2d 1277, 1285–87 (7th Cir.1977). The Fourth Circuit has acknowledged the sound reasoning of the Lloyd Court's holding and has held that a private right of action exists under Section 504 against a State entity. See Davis v. Southeastern Cmty. Coll., 574 F.2d 1158

(4th Cir.1978), rev'd on other grounds, Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); see also Pandazides v. Virginia Bd. of Ed., 13 F.3d 823, 828 (4th Cir.1994)(acknowledging Section 504 creates a private right of action). Therefore, pursuant to such authority, this Court holds that Shepard has a private right of action to sue under Section 504.

## B. Absolute Immunity for Honor Committee Members

■ Defendants Stidham, Murtha, Forbes, and Boatwright ("Honor Committee Members") are immune from personal liability pursuant to the doctrine of absolute immunity. Generally, the judicial system assumes that all individuals, whatever their position, are subject to the law. See Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec., 757 F.2d 676, 687 (5th Cir.1985). However, absolute immunity exempts an official from personal liability, when they hold an official position and perform specialized duties and the alleged offense falls under the scope of such duties. See id. (citing Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982)). Officials protected by absolute immunity do not have to face the rigors of full discovery or trial for claims arising within their official duties. See id. (acknowledging that such officials are subject to discovery to determine whether their actions were taken within the scope of their authority). Ultimately, the burden is on the person claiming absolute immunity to prove that public policy requires such a broad protection of the person's actions. See id.

■■ The "functional approach" must be utilized to determine whether an official is entitled to absolute immunity. See Butz v. Economou, 438 U.S. 478, 514–15, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). This

approach looks to the nature of the functions performed to determine whether the officials should be immune from prosecution. *See id.* Under such approach, an official is entitled to absolute immunity if (a) the official's function shares the characteristics of the judicial process, (b) the official's activities are likely to result in recriminatory lawsuits by disappointed parties, and (c) sufficient safeguards exist in the regular process to control unconstitutional conduct. *See id.* Administrative officials, who are subject to restraints and perform adjudicatory functions within an agency similar to those of judges and prosecutors, are entitled to absolute immunity. *See id.* at 514, 98 S.Ct. 2894.

■ Shepard alleges damages against the Honor Committee Members in their individual capacities for presiding over a Honor Council proceeding where the Members' sole purpose was to adjudicate allegations of academic dishonesty and recommend a sanction. (Compl.¶ 25.) The Honor Committee Members were presented with Shepard's case in an adversarial manner, they listened to the facts presented, and rendered their decision. The Honor Committee Members were essentially performing the function of judicial officers for GMU, as a state agency. Their performance of such duties makes them open to vexatious litigation and the threat of civil liability from accused students who are unhappy with the council's decision. Moreover, the Honor Council was subject

to procedures and administrative processes, which shaped the quasi-judicial adjudication. (Compl.¶¶ 38–40.) Therefore, pursuant to the reasoning in *Butz,* the Honor Committee Members are entitled to absolute immunity from damages for any claims arising out of the Honor Council proceeding because they were acting within a quasi-judicial capacity.[1]

C.  *Eleventh Amendment Protection of GMU, Dr. Mulherin, and Dr. Merten in their Official Capacities for Claims under the Rehabilitation Act and the ADA (Count III)*

■ Each state has sovereign immunity from lawsuits brought by private citizens under the Eleventh Amendment. *See* U.S. CONST. amend XI. The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

*Id.* Although the plain meaning of the Eleventh Amendment does not support states' sovereign immunity directly, the Supreme Court has extended the plain meaning to lawsuits brought by private citizens against their own state. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)(citing *Coll. Sav. Bank v. Florida*

---

1. Defendants also assert that the Honor Committee Members are entitled to qualified immunity. In light of the Court's holding that these students are entitled to absolute immunity, it is not necessary for the Court to reach this determination. Nonetheless, the Court holds that the Honor Committee Members would be entitled to qualified immunity because a reasonable official in their position would not have known it to be a violation of Shepard's constitutional rights not to allow an accused student to be represented by coun-

sel or have her mother testify as a witness. *See Henson v. Honor Comm. of U. Va.,* 719 F.2d 69, 74 (4th Cir.1983)(holding that the plaintiff student was afforded sufficient due process even though he was not permitted to have a practicing attorney represent him because he had adequate notice of the charges against him, the opportunity to be heard by disinterested parties, the right to confront his accusers, and the right to have the record reviewed by an appellate body).

*Prepaid Postsecondary Ed. Expense Bd.,* 527 U.S. 666, 669–69, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)).

■ Sovereign immunity extends to GMU as well as to Dr. Mulherin, and Dr. Merten in their official capacities. A state supported university enjoys the same sovereign immunity as States. *See Thorpe v. Virginia State University,* 6 F.Supp.2d 507, 509 n. 4 (E.D.Va.1998). Moreover, suits against state officials in their official capacities are considered suits against the state. See *Litman v. George Mason University,* 186 F.3d 544, 547 (4th Cir.1999). GMU is a state supported institution of higher education. *See id.* In addition, Shepard files suit against Dr. Mulherin and Dr. Mertin in their official capacities as GMU officials. Accordingly, GMU, Dr. Mulherin, and Dr. Mertin enjoy the same sovereign immunity as the Commonwealth of Virginia.

■ Sovereign immunity bars all claims against the States regardless of the type of relief. *See South Carolina State Ports Auth. v. Federal Maritime Comm'n,* 243 F.3d 165, 169–70 (4th Cir.2001). However, the immunity that States enjoy under the Eleventh Amendment is not absolute. States are not protected under the doctrine of sovereign immunity if (a) there exists a valid abrogation of that immunity by Congress, (b) a state has clearly and unequivocally waived its immunity, or (c) the prosecution of an action fits comfortably within the doctrine of *Ex parte Young.* See *Bell Atlantic Maryland v. MCI Worldcom, Inc.,* 240 F.3d 279, 288 (4th Cir.2001).

With respect to Count III of her Complaint, Shepard argues that GMU, Dr. Merten, and Dr. Mulherin are liable in their official capacities under the ADA and Rehabilitation Act because Congress validly abrogated Defendants' sovereign immunity with the enactment of these statutes prohibiting discrimination based on a disability. In addition, Shepard argues that GMU clearly waived its immunity from suit for claims under the Rehabilitation Act when Congress conditioned the receipt of federal funds in return for GMU's commitment not to discriminate on the basis of an individual's disability. Moreover, Shepard argues that the prosecution of her action fits comfortably within the doctrine of *Ex parte Young* because Defendants are committing an ongoing violation of federal law. Each argument is addressed in turn.

1. *Abrogation of Sovereign Immunity under Title II of the ADA*

■ In determining whether Congress has validly abrogated a state's sovereign immunity, courts generally look to the well-established two-prong test set forth in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996):(1) whether Congress intended to abrogate the state's sovereign immunity; and (2) whether Congress has acted pursuant to a valid exercise of its power. *Id.*

a. *Intent to Abrogate*

Congress clearly expressed its intent to abrogate States' sovereign immunity in passing Title II of the ADA. *See* 42 U.S.C. § 12101. Notwithstanding the Eleventh Amendment guarantees of immunity, the Fourteenth Amendment guarantees equal protection to citizens of the United States. *See* U.S. Const. amend XIV. Specifically, Section 1 of the Fourteenth Amendment provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *Id.* Section 5 of the Fourteenth Amendment empowers Con-

gress "to enforce the substantive guarantees contained in § 1 by enacting 'appropriate legislation.'" *Bd. of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)(quoting *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Pursuant to Section 5, Congress enacted the ADA, which requires that a qualified individual with a disability not be subjected to discrimination or otherwise be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, on the basis of such disability. *See* 42 U.S.C. § 12132. In addition, with respect to the ADA, Congress set forth that:

> A State shall not be immune under the [E]leventh [A]mendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter . . . .

*Id.* at § 12202. The unambiguous language of this statute demonstrates Congress' clear intention that states not be shielded by immunity from suit for ADA cases. *See Thompson v. Colorado,* 278 F.3d 1020, 1034 (10th Cir.2001); *Garcia v. SUNY Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 110 (2d Cir.2001); *Reickenbacker v. Foster,* 274 F.3d 974, 983 (5th Cir.2001). Thus, such provision is an attempt by Congress to abrogate States' sovereign immunity.

b. *Exercise of Section 5 Power*

██ Under the second *Seminole Tribe* prong, the Court must determine whether Congress validly exercised its Section 5 power under the Fourteenth Amendment. A valid Section 5 exercise of power by Congress "must exhibit 'congruence and proportionality between the injury to be

prevented or remedied and the means adopted to that end.'" *Garrett,* 531 U.S. at 365, 121 S.Ct. 955 (quoting *City of Boerne,* 521 U.S. at 520, 117 S.Ct. 2157). The inquiry concerning the "congruence and proportionality" of Congress' legislation is two-fold: (a) Congress must make findings of discrimination by the States; and (b) the resulting Congressional legislation must be specifically tailored to address the discovered discrimination. *See id.*

██ However, before turning to the "congruence and proportionality" analysis this Court must first "identify with some precision the scope of the constitutional right at issue." *Garrett,* 531 at 356, 121 S.Ct. 955. Where, as here, the Equal Protection Clause concerns people with disabilities, the Supreme Court has rejected the "quasi-suspect" classification and instead applied a "rational-basis" review. *See id.* (citing *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). In other words, "the Fourteenth Amendment does not require States to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Id.*

Under the "rational-basis" review, the *Garrett* Court considered whether Congress validly abrogated States' sovereign immunity under Title I of the ADA.[2] In its "congruence and proportionality" inquiry, the *Garrett* Court found that Congressional findings concerning employment discrimination of persons with a disability primarily involved local, not state, governments. *See id.* at 369, 121 S.Ct. 955. Moreover, the *Garrett* Court found that the few discriminatory instances involving state governments were too limited to con-

**2.** Title I of the ADA prohibits States and other employers from "discriminat[ing] against a qualified individual with a disability because

of th[at] disability . . . in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

stitute a practice or pattern of state discrimination. *See id.*

Despite its holding that there were little to no Congressional findings of state discrimination, the *Garrett* Court considered the proportionality of Title I of the ADA as a Congressional remedy. *See id.* at 370, 121 S.Ct. 955. In addition to rejecting the ADA Title I requirement for employers to make facilities accessible, the Supreme Court also determined that "the [reasonable] accommodation duty far exceeds what is constitutionally required in that it makes unlawful a range of alternative responses that would be reasonable but would fall short of imposing an 'undue burden' upon the employer." *Id.* The Supreme Court also noted that Title I of the ADA shifts the burden from the plaintiff to the defendant to establish that a reasonable accommodation would be an undue burden, which is a direct contradiction of the United States Constitution. *See id.* Finally, the Supreme Court compared Title I of the ADA to the Voting Rights Act ("VRA"), which the Court had previously upheld in *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). The VRA specifically targeted only the States where discrimination had been found. *See id.* at 328, 86 S.Ct. 803. In stark contrast, the Supreme Court found that "Congressional enactment of the ADA represents its judgment that there should be a 'comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Id.* at 373, 86 S.Ct. 803 (quoting 42 U.S.C. § 12101(b)(1)). Based on the foregoing reasons, the *Garrett* Court held that Congress invalidly exercised its Section 5 power to abrogate States' sovereign immunity under Title I of the ADA.

The *Garrett* Court specifically did not address Title II. However, in the wake of *Garrett,* several circuits have applied the *Garrett* Court's analysis to Title II of the ADA. *See Garcia,* 280 F.3d 98 (holding that Congress did not validly exercise its Section 5 authority to abrogate States' sovereign immunity under Title II of the ADA); *Thompson,* 278 F.3d at 1034 (same); *Reickenbacker,* 274 F.3d at 983 (same). *But see Popovich v. Cuyahoga Cty. Court of Common Pleas,* 276 F.3d 808, 815–16 (6th Cir.2002)(holding Congress did not validly abrogate a State's Eleventh Amendment immunity for actions brought under Title II of the ADA relying upon the Equal Protection Clause; however, Congress did validly abrogate such immunity with respect to Due Process considerations). In light of this case law and applying the "rational-basis" review, the Court turns to the "congruence and proportionality" inquiry.

Under the first prong of the "congruence and proportionality" inquiry, this Court still considers the Congressional findings as to the States' discrimination against people with disabilities in the provision of public services and public accommodations. As Justice Breyer denoted in his *Garrett* dissent, Congress held thirteen congressional hearings and created a special task force to determine the extent of state discrimination of the disabled. *See Garrett,* 531 U.S. at 377–378, 121 S.Ct. 955; App. A–C. As the *Garrett* majority noted, however, "at most, . . . 50 of these allegations describe conduct that could conceivably amount to constitutional violations by the States, and most of them are so general and brief that no firm conclusion can be drawn." *Id.* at 370 n. 7, 121 S.Ct. 955. The majority noted that almost all of these incidents were in the context of discrimination in public accommodations under Title II and III of the ADA. This Court finds that, even if all of the 50 allegations of discrimination based on disability are attributable to discrimination prohibited under Title II of the ADA, then these 50 incidents are still not sufficient to evidence

a pattern or practice of disability-based discrimination by the 50 States.

Nonetheless, even if the Court were to find that these 50 incidents did constitute a practice of discrimination, Title II of the ADA is overly broad and is not specifically tailored to the alleged discrimination as required by the second prong of the "congruence and proportionality" inquiry. The Equal Protection Clause mandates that similarly situated citizens enjoy similar treatment. *See Thompson,* 278 F.3d at 1031. However, Title II of the ADA shifts the burden to public entities to affirmatively provide equal treatment to persons with a disability by requiring the public entities to make "reasonable modifications." 42 U.S.C. § 12131(2). In particular, Title II prohibits discrimination "against an individual with a disability who with or without reasonable modifications to rules, policies, or practices ... meets the essential eligibility requirements for the receipt of services or activities provided by a public entity." *Id.* This affirmative obligation created by Title II of the ADA far exceeds the constitutional mandate within the Equal Protection Clause. *See Thompson,* 278 F.3d at 1031; *see also, Garrett,* 531 U.S. at 368, 121 S.Ct. 955 ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause."); *Erickson v. Bd. of Governors of State Colls. & Univs. for Northeastern Ill. Univ.,* 207 F.3d 945, 950 (7th Cir. 2000)("[N]o one believes that the Equal Protection Clause establishes the disparate-impact and mandatory-accommodation rules found in the ADA."). States are not constitutionally mandated to provide disabled individuals with special accommodations. *See Garrett,* 531 U.S. at 367–68,

121 S.Ct. 955. States are only required to refrain from discrimination that is not rationally related to a legitimate government purpose. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Title II of the ADA creates a nationwide affirmative obligation on public entities to accommodate disabled persons based on 50 overly broad incidents of local discrimination. Therefore, such congressional remedy is not congruent with nor proportional to the Congressional findings of state discrimination of persons with a disability.

Accordingly, this Court finds that Congress did not validly exercise its Section 5 authority under Title II of the ADA to abrogate States' sovereign immunity.

2. *Waiver of Sovereign Immunity under the Rehabilitation Act*

■ Congress enacted Section 504 of the Rehabilitation Act pursuant to the spending clause.[3] *See Frederick L. v. Dep't of Public Welfare,* 157 F.Supp.2d 509, 520 (E.D.Pa.2001)(citing cases acknowledging Section 504 as spending clause enactment). Under the Spending Clause, Congress may use federal funds to induce States to behave in a certain way by offering federal funds to States that agree to certain congressionally imposed conditions. *See West Virginia v. U.S. Dep't of Health & Human Servs.,* 289 F.3d 281, 286–87 (4th Cir.2002) (citing *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)). Ultimately, Congress presents States with a choice: the state can either comply with certain congressionally mandated conditions in exchange for federal funds or not comply and decline the funds. *See Lit-*

---

**3.** Article I, Section 8 of the United States Constitution gives Congress the power "to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States ...." *See* U.S. CONST. art. I, § 8, cl. 1 ("Spending Clause").

*man,* 186 F.3d at 547. However, specific limitations exist on the spending power of Congress. *See id.* at 552. In order for the expenditures associated with Congress' spending power to be upheld, the expenditures must (1) benefit the general welfare, and the conditions imposed on their receipt must (2) be unambiguous, (3) be reasonably related to the purpose of the expenditure, (4) not violate any independent constitutional prohibition, and (5) not be so coercive as to pass the point as to which pressure turns into compulsion. *See West Virginia,* 289 F.3d at 286–87 (citations omitted).

■■■■■ A state may waive its immunity by either explicitly specifying its intention to subject itself to suit in federal court, or by voluntarily participating in federal spending programs where Congress expressed a clear intent to condition receipt of a federal benefit or federal funds on the State's consent to waive. *See Booth v. Maryland,* 112 F.3d 139, 145 (4th Cir. 1997) (citation omitted). Waiver of immunity as a condition to the receipt of funds should be found only where a statute so provides "by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction." *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *McConnell v. Adams,* 829 F.2d 1319, 1329 (4th Cir.1987) (citation omitted). Mere participation by a state in a program through which the Federal Government provides assistance for the operation of a state system is insufficient to constitute consent to be sued in federal court. *See Florida Dep't of Health v. Florida Nursing Home Assoc.,* 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (citing *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909)); *Edelman,* 415 U.S. at 673, 94 S.Ct. 1347.

■■■■ GMU waived its sovereign immunity by accepting federal assistance under the Rehabilitation Act. Under the Rehabilitation Act, Congress stated that no disabled individual shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794. Congress provided further that:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of Section 504 of the Rehabilitation Act of 1973 [29 U.S.C. § 794] ... or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d–7. The Fourth Circuit has set forth that any state reading that provision would clearly understand that it was consenting to the resolution of disputes regarding alleged violations of the Act's anti-discrimination provisions. *See Bell Atlantic Maryland,* 240 F.3d at 292 (citing *Litman,* 186 F.3d at 553–54); *see also Douglas v. California Dept. of Youth Authority,* 271 F.3d 812, 819 (9th Cir. 2001); *Jim C. v. United States,* 235 F.3d 1079, 1082 (8th Cir.2000). Shepard alleges, and Defendants concede, that GMU receives federal assistance under the Rehabilitation Act. Accordingly, by receiving such funds, and due to the lack of ambiguity in the statute, GMU waived its sovereign immunity.

Defendants argue that GMU's waiver of immunity is invalid and unconstitutional for two reasons. First, Defendants argue that the waiver is invalid because GMU mistakenly believed that Congress already abrogated such immunity and therefore it did not knowingly waive its Eleventh Amendment immunity. Second, Defendants argue that GMU's waiver is unconstitutional because it was coercive. Each argument is addressed in turn.

### a. *Knowing Waiver*

Defendants argue that the context of GMU's acceptance of funds raises questions about the knowing and voluntary nature of GMU's waiver of sovereign immunity. Defendants argue that any state accepting conditioned federal funds under the Rehabilitation Act could not have understood that "in doing so it was actually abandoning its constitutional sovereign immunity from private damages suits" because the Rehabilitation Act expressly provides that a state shall not be immune under the Eleventh Amendment from an action in federal court. *See Garcia*, 280 F.3d at 110. Defendants contend that the decision of whether or not to accept funds was moot at the time such decision was made because any state would have been justified in its belief that its immunity from suit had already been abrogated by Congress.

The Court is unpersuaded by this argument. Essentially, Defendants ask the Court to disregard GMU's knowing waiver of immunity because it mistakenly believed that it was already exposed to suit by virtue of Section 2000d–7 abrogating their immunity. GMU knew that it was exposing itself to suit for actions under the Rehabilitation Act if it received federal funds. Defendants do not argue that GMU did not knowingly and voluntarily accept the waiver—just that GMU did not appreciate the gravity of such waiver. This Court holds as a matter of law that such lack of appreciation is insufficient to eviscerate GMU's knowing waiver.

### b. *Coercive Nature of Waiver*

Defendants argue further that GMU was unconstitutionally coerced into waiving its sovereign immunity. The Supreme Court has recognized that some financial inducements by Congress might be so coercive as to turn into compulsion. *See South Dakota v. Dole*, 483 U.S. 203, 211,

107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). Relying on such Supreme Court precedent, six out of the thirteen judges on the Fourth Circuit found coercive the congressional withholding of a $60 million grant on the basis that the Commonwealth of Virginia failed to provide private education services to less than one tenth of one percent (126) of the 128,000 handicapped students for whom the funds were earmarked. *See Commonwealth of Virginia v. Riley*, 106 F.3d 559, 569 (4th Cir.1997)(*en banc*) (Luttig, J.), *abrogated on other grounds by, Amos v. Maryland Dept. of Pub. Safety*, 126 F.3d 589 (4th Cir.1997). The Fourth Circuit held that such tactic began to resemble impermissible coercion because it forced a state agency to choose between providing services for a small number of students and surrendering all special education funds. *See id.* at 570 (stating in dicta that it is coercive to have a state forego the entirety of a substantial federal grant on the ground that the state agency refused to fulfill their federal obligation "in some insubstantial respect rather than submit to the demands of Washington."). Even though this holding was not essential to the disposition in *Riley*, it stands for the proposition that "the loss of an entire block of federal funds upon a relatively minor failing by a state [is] constitutionally suspect." *See West Virginia*, 289 F.3d at 291.

In *West Virginia*, the Fourth Circuit revisited the reasoning in *Riley* and acknowledged the quagmire that courts may become involved in when they utilize this coercion theory. *See id.* at 291 (citing cases). In *West Virginia*, the Fourth Circuit was faced with a situation where the Federal Government provided West Virginia $1 billion in Medicaid funds each year, yet recovered less than $2 million each year from an estate recovery plan. *See id.* at 291–92. Under the Medicaid statute at issue, once a state failed to enact an estate recovery program within the time frame

established by Congress, its Medicaid plan was no longer compliant. *See id.* At that time, "the Secretary shall notify [the] State agency that further payments will not be made to the State (or in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply." *See id.* (citing 42 U.S.C. § 1396c). West Virginia complied with the estate recovery provisions; therefore, all that remained was a constitutional attack on the face of the statute. The Fourth Circuit held that Congress' requirement that States participating in the Medicaid program implement the estate recovery provisions, or lose all or part of their funding, is not impermissibly coercive because it gives Congress the option of implementing less drastic means than complete withholding of all funds. *See id.* at 291–93.

Similar to the Medicaid statute, Section 504 is not unconstitutionally coercive because it is not an "all or nothing" statute. Section 504 prohibits "any program or activity" that receives federal financial assistance from discriminating against a qualified individual with a disability. *See* 29 U.S.C. § 794(a). The statute defines program or activity as all of the operations of a department, agency, or other instrumentality of a state, or each department or agency to which the federal assistance is extended. *See id.* at § 794(b). As the Eighth Circuit has noted,

> [B]y accepting funds offered to an agency, the State waives its immunity only

with regard to that individual agency that receives them. A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others. The State is accordingly not required to renounce all federal funding to shield chosen state agencies from compliance with Section 504.

*Jim C.,* 235 F.3d at 1081. This choice that Congress has given to States minimizes the effect of the drastic "all or nothing" choice denounced in *Riley,* and referenced later in *West Virginia.* Therefore, the choice presented by Congress under Section 504 not to discriminate or to refuse funding under the Rehabilitation Act is not unconstitutionally coercive.

Defendants argue further that the Section 2000d–7 requirement that GMU, as a state agency, choose between waving its sovereign immunity for all Section 504 claims and forfeiting all federal funds is unconstitutionally coercive because "if GMU wishes to receive federal funds for any reason, all aspects of GMU must subject themselves to claims under § 504." (Def. Mot. to Dismiss Br. at 32.) Defendants argue as a practical matter that this is not a choice at all because GMU receives approximately $44,183,959 or 14% of its total operating budget from federal funds. (Dean Merten Aff. ¶¶ 6–8.) This Court is disinclined to set parameters as to which point GMU's "choice" is no longer a choice, but coercion because the financial incentives are so great.[4] Nonetheless, this

---

4. The Supreme Court has admonished courts to attempt to avoid becoming entangled in ascertaining the point at which federal inducement becomes compulsion. *See Chas C. Steward Machine Co. v. Davis,* 301 U.S. 548, 589–90, 57 S.Ct. 883, 81 L.Ed. 1279 (1937)("Every rebate from a tax when conditioned upon conditions is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties. The outcome of such doctrine is the acceptance of philosophical determinism by which choice becomes impossible. Till now the law has been guided by a robust common sense which assumes the freedom of the will as a working hypothesis in the solution of its problems.");

Court holds that GMU did have a viable choice: it could have avoided the requirements of Section 504 simply by declining federal education funds. Similar to Defendants in this case, in *Jim C.*, the defendant argued that Section 504's waiver requirement was unconstitutional because it was overly broad and placed coercive conditions on federal funds. *See Jim C.*, 235 F.3d at 1081. The Eighth Circuit rejected such contention and acknowledged that Congress may attach conditions on the receipt of federal funds and may specifically require a waiver of state immunity from suit as a condition for receiving federal funds. *See id.* (citing *Coll. Sav. Bank*, 527 U.S. 666, 119 S.Ct. 2219). The *Jim C.* court held that the state education program could have avoided the requirement of Section 504 simply by declining federal education funds. *See id.* at 1082. The court held that the sacrifice of $250 million in federal education funds or 12% of the annual state education budget would not compel the State's decision and would not be so coercive as to exceed the limits of the Spending Clause. *See id.; see also New Hampshire Dep't of Employment Sec. v. Marshall*, 616 F.2d 240, 246 (1st Cir.1980) (recognizing that the state agency had a choice of declining forty million-dollars in tax credits to private employer). In comparing such financial incentives with that placed before GMU, this Court holds that it was not impermissibly coercive for Congress to condition GMU's receipt of approximately $44,183,959, or 14% of its total operating budget, on GMU's agreement to expose itself to suit in federal

court. Therefore, this Court holds that GMU's waiver was constitutional.

Based on the Court's conclusion that GMU waived its sovereign immunity, such waiver was knowing, and such waiver was not impermissibly coercive, this Court holds that the doctrine of sovereign immunity does not bar Shepard from asserting her Rehabilitation Act claim against GMU, Dr. Mulherin, and Dr. Merten in their official capacities.

3. *Immunity under the Ex parte Young doctrine for claims under Title II of the ADA*

Notwithstanding Congress' failure to abrogate immunity under Title II of the ADA, Dr. Mulherin and Dr. Merten remain exposed to liability under Title II of the ADA pursuant to the *Ex parte Young* doctrine.[5] The *Ex parte Young* doctrine allows suits against individuals in their official capacities for declaratory or injunctive relief. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). To overcome immunity under the *Ex parte Young* doctrine, an action must seek prospective injunctive relief to end a continuing violation of federal law. *See Quern v. Jordan*, 440 U.S. 332, 347–48, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). For example, claims for reinstatement by university students are prospective in nature and are appropriate subjects for *Ex parte Young* actions. *See Carten v. Kent State Univ.*, 282 F.3d 391, 396 (6th Cir.2002). However, the doctrine does not apply in situations where Congress has created a

---

see also *State of Oklahoma v. Schweiker*, 655 F.2d 401, 414 (D.C.Cir.1981) ("[C]ourts are not suited to evaluat[e] whether the states are faced here with an offer they cannot refuse or merely a hard choice."); *New Hampshire Dep't of Employment Security*, 616 F.2d at 246 ("We do not agree that the carrot has become a club because rewards for conforming have increased. It is not the size of the stake that controls, but the rules of the game.")

**5.** Defendants argue that the *Ex parte Young* doctrine does not apply to expose them to liability for claims under the Rehabilitation Act because the Rehabilitation Act contains a comprehensive remedial scheme. However, it is not necessary for the Court to reach such decision because of its holding that Defendants are already exposed to liability because GMU waived its sovereign immunity. *See infra* Part II.C.2.

remedial scheme for the enforcement of a particular federal right. *See Seminole Tribe*, 517 U.S. at 74, 116 S.Ct. 1114 (holding that suit under the *Ex parte Young* doctrine should not be allowed when the potential remedies would be impermissibly broad in light of that contemplated by Congress); *Bell Atlantic Maryland, Inc.*, 240 F.3d at 295. Moreover, the *Ex parte Young* doctrine does not apply to suits against a state or state entity, it is limited to suits against individual state officials who have a specific duty to enforce the program at issue. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir.2001).

■ The only state officials sued in their official capacity in this case are Dr. Mulherin and Dr. Merten. Moreover, Defendants acknowledge that Title II of the ADA does not contain a comprehensive remedial scheme. Therefore, the *Ex parte Young* doctrine potentially exposes Dr. Mulherin and Dr. Merten, as state entity officials, to prospective injunctive relief in their official capacities for claims under the ADA. Shepard seeks an injunction permitting her a new trial before the Honor Council where she would be allowed representation.[6] Similar to a student's desire to be reinstated into a University after being expelled, this Court holds that Shepard's request qualifies as prospective injunctive relief. Accordingly, Dr. Mulherin and Dr. Merten are exposed to liability for claims by Shepard under the ADA that seek prospective injunctive relief.

D. *Immunity for Defendants in Their Individual Capacities for ADA and Rehabilitation Act Claims*

■ The Eleventh Amendment does not bar actions against defendants in their individual capacities. *See Romano v. Bible*, 169 F.3d 1182, 1185 (9th Cir.1999). A plaintiff may utilize 42 U.S.C. § 1983 to enforce their constitutional and federal statutory rights unless (1) such statute does not create enforceable rights, privileges or immunities within the meaning of Section 1983 or (2) Congress has foreclosed such enforcement of the statute in its enactment. *See Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1530 (11th Cir. 1997) (citing *Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)). Courts should assume that Congress intended that a statutory enforcement mechanism provided in a statute is exclusive and bars a Section 1983 claim. *See Lollar v. Baker*, 196 F.3d 603, 610 (5th Cir.1999).

■ Shepard cannot use Section 1983 to enforce her rights against individuals under the ADA because the ADA does not permit a cause of action against persons in their individual capacities. *See Baird v. Rose*, 192 F.3d 462, 471 (4th Cir.1999); *Doe v. Div. of Youth and Family Servs.*, 148 F.Supp.2d, 462, 489 (D.N.J.2001). In a similar context to that of Shepard where a disabled student was seeking a reasonable accommodation, the Fourth Circuit held that the remedies available for a violation under the ADA were set forth in Title VII. *See Baird*, 192 F.3d at 472 (citing 42 U.S.C. § 12117). The court held that the enforcement provision of Title VII permits actions against employers and defines employers as "a person engaged in an industry affecting commerce who has 15 or more employees." *See id.* (citing 42 U.S.C. § 2000e(b)). Title VII does not provide a remedy for those who do not qualify as an employer. Therefore, the

---

6. Shepard also seeks an injunction requiring Dr. Irving to provide her additional time to complete academic assignments; however, the *Ex parte Young* doctrine does not apply to Dr. Irving because Dr. Irving is not a state official who was sued in her official capacity. (Compl.¶ 7.)

Fourth Circuit held that the ADA does not permit an action against individuals who are not employers. *See id.* Under the reasoning in *Baird,* Dr. Merten, Dr. Mulherin, and Dr. Irving are not employers in their individual capacities within the context of Title VII. Therefore, Shepard cannot assert a cause of action against them in their individual capacities under the ADA.

A person cannot enforce the Rehabilitation Act pursuant to Section 1983 because the Act provides a specific comprehensive internal enforcement mechanism structured to protect the rights of disabled individuals. *See Lollar,* 196 F.3d at 609–610 (holding that comprehensive remedial scheme under the Rehabilitation Act precludes Section 1983 action); *Holbrook,* 112 F.3d at 1531 (holding that the comprehensive remedial schemes under Section 504 of the Rehabilitation Act and Title I, not Title II, of the ADA precludes Section 1983 action). Based on this comprehensive remedial scheme, Congress intended to foreclose a plaintiff's reliance on Section 1983 to remedy alleged statutory violations. *See Lollar,* 196 F.3d at 610; *Holbrook,* 112 F.3d at 1531. Shepard alleges violations under the Rehabilitation Act against Defendants in their individual capacities for failing to reasonably accommodate her disability. (Compl.¶ 58.) She seeks damages as well as a preliminary and permanent injunction allowing her reasonable accommodations. This remedy is addressed under the Rehabilitation Act, *see* 29 U.S.C. § 794a(a)(2), and therefore is not actionable under Section 1983. *See Holbrook,* 112 F.3d at 1531 (holding persons may not maintain Section 1983 actions in addition to a Rehabilitation Act cause of action if deprivation is of the rights deprived of under Act).

Therefore, Shepard does not have a cause of action against Defendants in their individual capacities because the ADA and Rehabilitation Act are not actionable against individuals and the plaintiff cannot bring suit under Section 1983. Accordingly, Shepard cannot sustain a cause of action against Defendants in their individual capacities for violations under the ADA and Rehabilitation Act.

E. *Qualified Immunity under First Amendment (Count I) and First Amendment (Count II) claims*

Defendants Dr. Irving, Dr. Mulherin, and Dr. Merten are entitled to qualified immunity for Shepard's claims brought pursuant to the Fourteenth Amendment and First Amendment. A citizen has the Constitutional right to free speech and to not be deprived of a liberty or property interest without Due Process under the law. *See* U.S. CONST. amend. I, XIV. Section 1983 imposes civil liability on an officer who deprives a person of her Constitutional rights. *See* 42 U.S.C. § 1983. The doctrine of qualified immunity protects government officials from civil damages in Section 1983 actions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The Supreme Court sets forth a two-prong test for analyzing a claim of qualified immunity in the context of an alleged constitutional violation. *See Taylor v. Waters,* 81 F.3d 429, 433 (4th Cir.1996)(citing *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727). The court must determine: (1) whether there was a clearly established right, and (2) whether a reasonable officer would have known that he violated such right. *See id.* Under the first prong, the court must ascertain whether the plaintiff has alleged the deprivation of an actual constitutional right. *See Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d

818 (1999). If an actual constitutional right is alleged, then the court must determine whether that right was clearly established at the time of the alleged infringement. *See id.; Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

In order for a right to be clearly established, "the 'contours of the right' must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Swanson v. Powers,* 937 F.2d 965, 969 (4th Cir.1991)(citing *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). In order to determine whether a right was clearly established at the time of the claimed violation, courts in this circuit only need to look at decisions of the United States Supreme Court, the Fourth Circuit, and the highest court of the state in which the case arose. *See Wallace v. King,* 626 F.2d 1157, 1161 (4th Cir.1980). Once this determination is made, the court must then consider whether a reasonable person in the official's position should have known that her conduct would violate the identified right. *See Harlow,* 457 U.S. at 819, 102 S.Ct. 2727. This Court need not reach the second prong of the qualified immunity test because the first prong shields Dr. Irving, Dr. Mulherin, and Dr. Mertin from liability under Shepard's Fourteenth Amendment (Count I) and First Amendment (Count II) claims.

With respect to Count I, the Court must determine whether Shepard had a clearly established right to have (1) Dr. Irving abide by GMU's policy of not filing honor charges more than fifteen days after Dr. Irving realized the violation; (2) an attorney, law student, or her mother represent her before a student disciplinary proceeding; or (3) her mother testify as a witness during the Honor Council proceedings. Shepard fails to prove that these are clearly established rights because the contours of these rights are not conclusively drawn to establish a constitutional violation.

First, a University official's failure to abide by a university's proscribed policy for disciplinary proceedings in not clearly established in this Circuit. *See Kilcoyne v. Morgan,* 664 F.2d 940 (4th Cir.1981) (holding that deviation from procedural safeguards in a university employment contract beyond those constitutionally mandated would not support a claim under the Fourteenth Amendment). Second, a university's policy of not allowing a student to be represented by an attorney, law student, or another person of her choice is not a clearly established violation of a student's Due Process rights. *See Henson v. Honor Comm. of U. Va.,* 719 F.2d 69, 74 (4th Cir.1983) (holding that the plaintiff student was afforded sufficient due process even though he was not permitted to have his person of choice, a practicing attorney, represent him); *see also Bd. of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 85, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (holding that academic deficiency dismissals do not necessitate a hearing before a school's decision-making body; therefore, a dismissed student did not have any right to be represented by counsel or to confront and cross-examine witnesses). Third, Defendants' action of not allowing Shepard's mother to testify on her behalf is not a clearly established violation of Shepard's constitutional rights. *See Clark v. Whiting,* 607 F.2d 634, 643–45 (4th Cir. 1979) (holding that the plaintiff professor was not entitled to the right to confront and cross-examine witnesses heard by the judicial panel and the process due did not have to go beyond the right to know the ground of the denial and opportunity to present his position); *see also Goss v. Lopez,* 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that if suspended for less than ten days that due process requires that the student be given oral or written notice of the charges

against him, an explanation of the evidence and authorities, and an opportunity to present his side of the story). Therefore, Defendants are entitled to qualified immunity for allegations that they deprived Shepard of her right to due process under the Fourteenth Amendment.

With respect to Count II, Shepard alleges a First Amendment "right to address her grievances." Shepard never alleges the deprivation of a constitutional right. *See supra* Part II.F.2. Therefore, Defendants are entitled to qualified immunity for allegations that they deprived Shepard of her First Amendment Rights. *See Wilson,* 526 U.S. at 609, 119 S.Ct. 1692 (alluding to the fact that a failure to assert the deprivation of an actual constitutional right would entitled the defendant to qualified immunity).

Accordingly, Defendants are immune from liability for civil damages for Shepard's claims arising under the Fourteenth Amendment Due Process Clause (Count I) and the First Amendment (Count II).

In sum, immunity attaches to the respective Defendants as follows. First, the Honor Committee Members are immune from liability on all claims raised by Shepard pursuant to the doctrine of absolute immunity. Second, GMU is completely immune from liability for claims arising under Title II of the ADA because Congress failed to properly abrogate its immunity and it is not subject to suit under 42 U.S.C. § 1983. Third, all Defendants are immune from liability in their individual capacities for claims arising under Title II of the ADA and the Rehabilitation Act (Count III) because these statutes are not actionable against individuals and Shepard cannot bring suit under Section 1983. Fourth, all Defendants are immune from liability for civil damages for Shepard's claims arising under the Fourteenth

Amendment Due Process Clause (Count I) and the First Amendment (Count II) because Shepard failed to assert a clearly established right of which Defendants should have known.

In light of the aforementioned holdings on immunity, the following claims remain for the Court to analyze with respect to Shepard's motion to dismiss for failure to state a claim. GMU, Dr. Mulherin, and Dr. Merten remain liable in their official capacities for claims under the Rehabilitation Act (Count III). Dr. Mulherin and Dr. Merten are exposed to prospective injunctive relief for claims arising under Title II of the ADA (Count III). Defendants in their official capacities remain liable for relief, other than for civil damages, for claims arising under the Fourteenth Amendment (Count I) and First Amendment (Count II). The Court now turns to Defendants' motions to dismiss for failure to state a claim with respect to these remaining claims.

### F. *Failure to State a Claim*

Defendants argue in the alternative, that the Court should dismiss Shepard's claims because she fails to state a claim upon which relief may be granted. For the reasons stated below, Shepard cannot prove any set of facts in support of her Fourteenth Amendment (Count I), First Amendment (Count II), or ADA and Rehabilitation Act (Count III) claims that would entitle her to relief. *See Conley,* 355 U.S. at 45–46, 78 S.Ct. 99.

#### 1. *Due Process under the Fourteenth Amendment (Count I)*

▬▬▬ Shepard argues that Defendants deprived her of a liberty interest to her reputation and future employment because she received a low grade on her report card.[7] The Fourteenth Amendment

---

**7.** Shepard also alleges in her Complaint that Defendants deprived her of a property interest

to her education at GMU. It is possible that a

prohibits a state from depriving a person of liberty or property interests. *See Bd. of Regents v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The deprivation of a person's good name, reputation, honor, or integrity may constitute the deprivation of a liberty interest. *See id.* at 573, 92 S.Ct. 2701. However, injury to reputation without an injury to some other right or status previously recognized by law, does not deprive a plaintiff of a liberty interest that is protected by the Fourteenth Amendment. *See Paul v. Davis,* 424 U.S. 693, 709–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (acknowledging examples of "some other injury" to be termination of employment or demotion). In addition, a plaintiff has a liberty interest in being free from arbitrary restrictions on the opportunity for gainful employment that stems from reasons provided by the government for terminating such plaintiff. *See Boston v. Webb,* 783 F.2d 1163, 1167 (4th Cir.1986). However, reasons that are not publicly disclosed by the state agency will not form the basis for a deprivation of a liberty interest. *See Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) (holding that the discharge of a public employee, whose position is terminable at will, does not deprive the employee of a liberty interest if there is no public disclosure of the reasons for the discharge); *Fuller v. Laurens County School District No.,* 563 F.2d 137, 141 (4th Cir.1977) (holding that the disparaging facts were not disclosed publicly by school authorities; therefore, the school officials did not deprive the plaintiff of a liberty interest in her good name or reputation).

Shepard does not allege the deprivation of a liberty interest protected under the Fourteenth Amendment. Under the allegations in Shepard's Complaint, Dr. Irving filed a claim with the Honor Committee accusing Shepard of plagiarism, then the Honor Committee affirmed the "F" Shepard received in her class, issued her a reprimand, and directed her to undergo community service. (Compl.¶¶ 24, 32.) Shepard argues that the "F" in English and being brought up on honor charges for plagiarism will forever be on her permanent record and such disparaging remarks have and will continue to hinder Shepard's ability to secure future employment.

■ The right to receive a passing grade in a class and not to be charged with plagiarism are not liberty interests protected under the Fourteenth Amendment to the Constitution. Neither amount to an injury to another's right or status previously recognized by law. Neither prohibited her from graduating: Shepard was neither suspended nor expelled from school. Moreover, no indication exists that Defendants disclosed the "F" or the allegations of plagiarism to the public. Ultimately, Shepard cannot challenge the procedures utilized by Defendants because they did not deprive her of a recognized constitutional interest. *See, e.g., Clark,* 607 F.2d at 641 (citing *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (noting that in order "to be entitled to a due process hearing, one must have suffered … a loss of either a property or a liberty interest.")); *see also Tigrett v. Rector and Visitors of the University of Virginia,* 290 F.3d 620, 626–27 (4th Cir. 2002) (holding that because the plaintiffs were not expelled by the university judicial panel, as alleged, that they had not been

person may have a property interest in their continued education. *Cf. Pittman v. Wilson County,* 839 F.2d 225, 229 (4th Cir.1988) (acknowledging that a property right to continued employment may exist). However, even if Shepard would have an interest in her continued education at GMU, she was not deprived of such interest because Shepard was never expelled nor suspended from GMU. Therefore, Shepard has not properly alleged the deprivation of a constitutionally protected property right.

deprived of any constitutionally protected interest). Accordingly, Shepard fails to state a claim for violations of her rights under the Due Process clause of the Fourteenth Amendment.

### 2. Retaliation under the First Amendment (Count II)

■ Shepard fails to state a claim for retaliation under the First Amendment. The First Amendment prohibits Congress from making any law abrogating the freedom of speech. *See* U.S. CONST. amend I. In order to state a claim for retaliation under the First Amendment, it is essential for a plaintiff to show that she suffered some adversity in response to her exercise of a protected right. *See American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md.,* 999 F.2d 780, 785 (4th Cir.1993) (citing *Huang v. Bd. of Governors of University of North Carolina,* 902 F.2d 1134, 1140 (4th Cir.1990)). In particular, the plaintiff must allege that the defendant's actions adversely affected the plaintiff's First Amendment Rights. *See id.* (noting that the withdrawal of an ACLU paralegal is not a sufficiently adverse action to constitute retaliation).

■ Shepard's retaliation claim is twofold. First, Shepard claims that in retaliation for her complaint about Dr. Irving, Dr. Irving gave her a failing grade. (Compl.¶ 48.) Second, Shepard claims that in retaliation for Shepard contesting the grade in Honor Council, Dr. Irving disparaged Shepard's reputation, prevented her graduation, and prevented her anticipated employment. (Compl. ¶ 49.) Shepard fails to allege that Defendants' actions adversely impacted any First Amendment right to free speech or otherwise. Accordingly, Shepard fails to state a claim for retaliation.

### 3. Title II of ADA and Rehabilitation Act (Count III)

■ Shepard attempts to allege causes of action against Defendants for violations under the ADA and the Rehabilitation Act. Both statutes prohibit qualified individuals from being excluded from participation in, being denied the benefit of, or otherwise being subject to discrimination in services or programs of a public entity on the basis of a person's disability. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a). In order to state a claim under the ADA or the Rehabilitation Act, a plaintiff must allege that (1) she has a disability, or is perceived to have such disability; (2) she is otherwise qualified for the benefit or program at issue; and (3) the defendant excluded her from the benefit or program based on her disability. *See Baird,* 192 F.3d at 467. The ADA defines a qualified individual with a disability as an individual who, with or without reasonable accommodations, can perform the essential functions of the position that the individual holds. *See Tyndall v. Nat'l Educ. Ctrs.,* 31 F.3d 209, 212–13 (4th Cir.1994); 42 U.S.C. § 12111(8). Therefore, students in higher education must be able to comply with the essential functions of higher education, which includes abiding by the honor code. *See Childress v. Clement,* 5 F.Supp.2d 384, 391 (E.D.Va.1998).

Shepard fails to state a claim under the Rehabilitation Act and the ADA. Shepard properly alleges the first two prongs of a ADA and Rehabilitation Act claim. First, Shepard alleges that she has a disability, and that GMU regarded her as having a disability, as defined under the ADA and Rehabilitation Act. (Compl.¶ 54.) Second, Shepard alleges that she is otherwise qualified for the benefit or program at issue because she is able to perform all the essential functions of being a student with reasonable accommodations. (Compl.¶ 55.)

However, completely absent from Shepard's complaint is the factual allegation that Defendants excluded her from the benefit or program or otherwise discriminated against her based on her disability. Shepard argues that she was not permitted additional time to complete her assignments nor given proper representation before the Honor Council. She does not state that this was because of a disability. Therefore, Shepard fails to state a claim under the Rehabilitation Act and the ADA because the allegations in the Complaint do not allege that she was excluded from a service, program, or benefit because of her disability.

## III. CONCLUSION

Based on the foregoing analysis, this Court holds as follows. First, Shepard may maintain a private cause of action under Section 504 of the Rehabilitation Act. Second, the Honor Committee Members are entitled to absolute immunity from damages for any claims arising out of the Honor Council proceeding because they were acting in a quasi-judicial capacity. Third, Congress did not properly abrogate a State's immunity under Title II of the ADA thus shielding GMU, Dr. Mulherin, and Dr. Merten to potential liability in their official capacities. Fourth, the *Ex parte Young* doctrine exposes Dr. Mulherin and Dr. Merten to liability for prospective injunctive relief for Shepard's claims under the ADA against them in their official capacities. Fifth, Shepard does not have a cause of action against Dr. Irving, Dr. Mulherin, and Dr. Merten in their individual capacities for violations under the ADA and Rehabilitation Act because these statutes are not actionable against individuals and Shepard cannot bring suit under 42 U.S.C. § 1983.

Sixth, the doctrine of sovereign immunity does not bar Shepard from asserting her Rehabilitation Act claims against GMU, and Dr. Mulherin, and Dr. Merten in their official capacities because GMU waived such immunity when it accepted Congressional funds. Seventh, the doctrine of qualified immunity shields all Defendants from liability for civil damages for Shepard's claims arising under the Fourteenth Amendment Due Process Clause (Count I) and the First Amendment (Count II) because Shepard never alleges the deprivation of any clearly established constitutional right.

Eighth, Shepard fails to state a claim for discrimination under the Fourteenth Amendment because she does not allege the deprivation of any recognized constitutional interest. Ninth, Shepard fails to state a claim for retaliation under the First Amendment because she fails to allege that she suffered some adversity in response to her exercise of a protected right. Finally, Shepard fails to state a claim under the Rehabilitation Act and the ADA because the allegations in the Complaint do not allege that she was excluded from any service, program, or benefit. Accordingly, it is hereby

ORDERED that Defendants' Motions to Dismiss the Complaint are GRANTED in their ENTIRETY.